## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARIO GALEA,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 4:04-1076** |
| **v.** | : | **(MCCLURE, D.J.)** |
| | | **(MANNION, M.J.)** |
| **HHS, Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |
| | : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Supplemental Security Income, ("SSI"), under Title XVI of the Social Security Act, ("Act"). 42 U.S.C. §§ 1381-1383f.

Based upon a review of the record, it is recommended that the plaintiff's appeal from the decision of the Commissioner of Social Security, (Doc. No. 1), be **DENIED.**

## I. Procedural Background

The plaintiff protectively filed his application for SSI benefits on July 3, 2003 in which he alleged disability since July 15, 2001 due to anxiety and depression. (TR. 11, 39, 44).

After his claim was denied (TR. 25-30), the plaintiff's application

eventually came on for hearing before an administrative law judge, ("ALJ"), on January 27, 2004.  The plaintiff was represented at his hearing before the ALJ by the same counsel representing him in this appeal.   In addition to the plaintiff's testimony, the ALJ heard testimony from Janice Galea, plaintiff's mother, and Carmine Abraham, a vocational expert.  (TR. 145-186).

On February 5, 2004,  the ALJ issued a decision in which he found that the plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 15, 2001; that the medical evidence of record established that the plaintiff had a depressive disorder and an anxiety disorder which were severe, but that the plaintiff did not have an impairment, or combination of impairments, severe enough to meet or equal the criteria of any of the listed impairments set forth in Appendix I, Subpart P, Social Security Administration Regulations No. 4.  The ALJ found that the plaintiff did not have any physical impairments which caused exertional limitations and he could have done the full range of all levels of exertional work.  The ALJ determined that the plaintiff did, however, have psychological problems which restricted him to work activity which was not detailed or complex and involved working with things and not people; that the plaintiff was a 29 year old younger individual with a high school and college education, whose past work activity was as a computer graphic artist designer which was sedentary in exertion and skilled in nature.  The ALJ also found that the plaintiff did not have the residual functional capacity to perform his past work activity because he was unable

to perform the full demands of that position, but that the plaintiff had the residual functional capacity[1] to perform the jobs which were identified and enumerated by the impartial vocational expert ("VE").

Based on the VE's testimony, the ALJ determined that there were other jobs which existed in significant numbers in the national economy which the plaintiff could have performed, consistent with his medically determinable impairments, functional limitations, age, and education; therefore, the plaintiff was found "not disabled" using the framework of vocational rule 204.00 of the Medical-Vocational Guidelines for decision-making.  The ALJ concluded that the plaintiff had not been under a disability, as defined in the Social Security Act, at any time since his alleged onset date of July 15, 2001.  Therefore, he was not eligible for supplemental security income.  (TR. 17).

Plaintiff filed a request for review of the ALJ's decision. (TR. 6-7).  On March 18, 2004, the Appeals Council concluded that there was no basis upon which to grant his request for review. (TR. 3-5).  Thus, the ALJ's decision stood as the final decision of the Commissioner.

Currently pending before the Court is the plaintiff's appeal of the

---

[1]Residual functional capacity is defined as follows:
> *Your residual functional capacity.*
> (a) General.  Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations.  20 C.F.R. § 404.1545(a).

decision of the Commissioner of Social Security filed on May 14, 2004.  (Doc. No. 1).

## II. Disability Determination Process

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work.  See 20 CFR § 416.920 (2000).

The instant action was ultimately decided at the fifth step of the process when the ALJ determined that the plaintiff was not under a disability as defined in the Social Security Act, at any time through the date of his decision. There existed other jobs, in significant numbers in the national economy, which the plaintiff could have performed consistent with his medically determinable impairments, functional limitations, age, education and work history.  (TR. 16).

## III.  Evidence of Record

The plaintiff was born on February 16, 1974 and was twenty-nine (29)

4

years old at the time of the ALJ's decision.  (TR. 39, 148).  He has a college education and past relevant work experience as a computer graphic specialist.  (TR. 13, 45, 50, 151).

The medical evidence of record establishes that on January 14, 1998, the plaintiff saw Danila A. de Soto, M.D. for a psychiatric evaluation.  Dr. De Soto mentioned that the plaintiff complained of problems with depression and difficulty getting readjusted after leaving college.  (TR. 65).  He also informed Dr. de Soto that his girlfriend had called off their relationship in November of 1997 and that since that time he had been feeling more depressed.  (TR. 65). He reported difficulty sleeping, decreased appetite, poor energy, poor motivation, decreased concentration and feelings of anergia[2] with a decrease in his motivation.  (TR. 65).  Mental status exam findings show that the plaintiff's mood was anxious and depressed, but that his thought processes were relevant and his memory was grossly intact.  (TR. 66).  Dr. de Soto diagnosed the plaintiff with major depression.  (TR. 66).  He ruled out schizoid personality.    (TR. 66).    Dr. de Soto started the plaintiff on Zoloft. Psychotherapy and progress notes indicate that plaintiff responded well to these forms of treatment.  (TR. 66).  As a result of treatment, the plaintiff became less depressed and began getting more involved in activities including art work and computer programming.  (TR. 74).  In fact, plaintiff's

---

[2]Inactivity;  lack of energy.  TABERS CYCLOPEDIC MEDICAL DICTIONARY at 107 (19th ed. 2001).

mental status improved to the point where he returned to school to study computer aided design.  (TR. 71).  Dr. de Soto's office records show that plaintiff was able to adjust well to this environment.  (TR. 69).  The last time Dr. de Soto saw the plaintiff was in December of 1999.  (TR. 67).

In February of 2001, the plaintiff finished school and accepted a job as a computer graphic specialist.  Unfortunately, the plaintiff was laid off in July, 2001, because of a staff reduction.  (TR. 44).  At that time he began having problems with increasing depression, apathy and low self-esteem.  Office records from Dr. Kevin G. Williams, M.D., plaintiff's family physician, show that plaintiff was restarted on Zoloft which improved in his symptoms. (TR. 81-83). Progress notes of September 20, 2001 show that the plaintiff was a little anxious, but did not appear tearful or depressed.  Dr. William's impression was endogenous depression.[3]   (TR. 83).   He reported that plaintiff was tolerating his prescribed medication and doing quite well on it.  (TR. 83).

In December, 2002, plaintiff began seeing a psychiatrist in Clarks Summit for his depression.  This physician changed plaintiff's medication to Effexor.   His office records show that this medication helped plaintiff's symptoms to some degree.  (TR. 76-80).  However, the plaintiff stopped seeing his physician in April of 2002 because of financial difficulty and no

---

[3]endogenous depression - Any depressive disorder occurring in the absence of external precipitants and believed to have a biologic origin. Spellman's Medical Dictionary, 478 (27th Ed. 2000).

insurance.  (TR. 81).  Dr. Williams referred plaintiff to the local Mental Health/Mental Rehab for psychiatry and psychological evaluation and treatment.  (TR. 81).

On July 29, 2002, the plaintiff saw Gail Beldia, M.D. for an evaluation. Mental status exam findings showed that plaintiff's affect was somewhat restricted, but not anxious.  (TR. 87).  He described his mood as anxious and depressed.  (TR. 87).  Plaintiff reported feeling somewhat threatened when away from his family.  (TR. 87).  Dr. Beldia noted plaintiff was trying to find a job, but had been rejected from one company and had not heard from the other companies he applied to.  (TR. 88).  He also reported difficulty making relationships with females and being uncomfortable around people.  (TR. 88). Dr. Beldia's impressions were a possible social phobia and an occupational problem.  (TR. 87).  She ruled out generalized anxiety disorder.  Dr. Beldia rated the plaintiff's global assessment functioning ("GAF") as 60-65.  (TR. 87). According to the DSM- IV Manual, this score reflects that the claimant was having mild to moderate difficulty with social and occupational functioning.  Dr. Beldia made adjustments to plaintiff's medication and recommended outpatient counseling.  (TR. 88).

On November 22, 2002, plaintiff saw Ashokkumar C. Patel, M.D. for a consultative evaluation.  (TR. 92-96).  Dr. Patel mentioned that the plaintiff reported seeing a counselor at Tri-County Mental Health/Mental Rehab, seeing Dr. Nezezon and taking Effexor - XR which he explained was helpful.

(TR. 92).  Mental status exams show that the plaintiff's mood was a little anxious but that his speech was clear, coherent, well balanced and without any looseness of association.   There was no evidence of any psychotic thought processes. The plaintiff denied suicidal or homicidal ideations, hallucinations, obsessions or compulsive rituals. (TR. 92). Dr. Patel diagnosed plaintiff as having a generalized anxiety disorder and dysthymia.  (TR. 92).

Dr. Patel completed a questionnaire which revealed that plaintiff's conditions did not seriously interfere with his ability to function considering that he was unlimited in understanding, remembering and carrying out simple job instructions and maintaining personal appearance.  (TR. 95-110).  He had a good ability to follow work rules, relate to co-workers, deal with the public, use judgment, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability.   (TR. 95).   He had a fair ability to interact with supervisors, deal with work stresses, function independently and maintain attention and concentration.  (TR. 95).

Office records from Dr. Williams show that in December of 2002, the plaintiff said that he still had a lot of agoraphobia[4] and some depression but that it was not as severe as it was previously.  (TR. 118).  Plaintiff reported that he was doing a little graphic design for his own use and conversing with

---

[4]Overwhelming symptoms of anxiety that occur on leaving home; a form of social phobia. TABER'S CYCLOPEDIC MEDICAL DICTIONARY at 56 (19th ed. 2001).

8

his friends.  (TR. 118).  An office note dated September 26, 2003, reveals that a plaintiff was comfortable and doing a little work on the side, even opening a website.  Although he said he was not getting out of the house much, he did report keeping in contact with college friends.  (TR. 116).

## IV.  Discussion

In support of his appeal, plaintiff presents several arguments.  Plaintiff first argues that substantial evidence does not support the ALJ's decision that plaintiff did not have an impairment that met or exceeded the criteria set forth in Appendix I, Subpart P, Social Security Administration Regulations No. 4 ("Listings").   Next, plaintiff asserts that the ALJ erred in finding plaintiff's testimony not fully credible.   Finally plaintiff states that the ALJ erred in discounting the opinion of plaintiff's treating physician.

### A.  *WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DECISION THAT THE PLAINTIFF'S IMPAIRMENTS DO NOT MEET OR EQUAL ANY OF THE LISTINGS.*

The Listings recognize that affective disorders can be so severe as to constitute a Social Security Disability.[5]  The plaintiff argues that the ALJ erred

---

[5]Section 12.04 of the Listings defines affective disorders as follows: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life: it generally involves either depression or elation. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(2001).

at step three of the sequential evaluation in finding that plaintiff's mental

disorders did not meet or equal listing 12.04.  The Commissioner enumerates

certain findings that govern when the requirements of the Listing are met.[6]

First, an applicant must exhibit at least four of nine specified disorders

(section12.04 A factors).[7]  Second, the applicant must also exhibit at least two

_____

[6]The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.  20 C.F.R. Pt.404, Subpt. P, App. 1, § 12.04 (2001).

[7]Section A factors are listed as "medically documented persistence, either continuous or intermittent, of one of the following.
 1. Depressive syndrome characterized by at least four of the following:
    a.   anhedonia or pervasive loss of interest in almost all activities; or
    b.   appetite disturbance with change in weight; or
    c.   sleep disturbance; or
    d.   psychomotor agitation or retardation; or
    e.   decreased energy; or
    f.   feelings of guilt or worthlessness; or
    g.   difficulty concentrating or thinking; or
    h.   thoughts of suicide; or
    I.   hallucinations, delusions, or paranoid thinking; or

 2. Manic syndrome characterized by at least three of the following:
    a.   hyperactivity; or
    b.   pressure of speech; or
    c.   flight of ideas; or
    d.   inflated self esteem; or
    e.   decreased need for sleep; or
    f.   easy distractibility; or
    g.   involvement in activities that have a high probability of painful consequences which are not recognized; or
    h.   hallucinations, delusions or paranoid thinking; or

of four specified consequences of the disorders ("Section 12.04 B factors").[8]

It is clear that the Third Circuit requires the ALJ to identify the relevant listed impairments and to provide an explanation of the reasoning for a finding that a claimant does not meet or equal a listed impairment.  See Burnett v. Commissioner, 220 F.3d 112, 120 (3d Cir. 2000).  In Burnett, our Court of Appeals held that at step three in the sequential determination process, an ALJ may not summarily conclude that a claimant does not meet any of the listed impairments, but rather, must discuss the relevant listed impairments and discuss whether and why the plaintiff's impairments do or do not meet or equal the requirements of the relevant impairments.

A claimant must prove that his condition meets or equals the specific clinical requirements of an impairment in the listing of impairments before he can be considered to be disabled per se without consideration of vocational factors such as age, education and work experience.  Sullivan v. Zebley, 493

---

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes).  20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.04 (2004).

[8]Section B factors are described as "Resulting in at least two of the following:
    1.  Marked restriction of activities of daily living; or
    2.  Marked difficulties in maintaining social functioning; or
    3.  Marked difficulties in maintaining concentration, persistence or pace; or
    4.  Repeated episodes of decompensation, each of extended duration.
20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.04 (2004).

U.S. 521, 530 (3d Cir. 1990); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citations omitted).  Plaintiff claims that he satisfies the elements of Listing 12.04 and that the ALJ erred in finding that he did not meet or equal this listing.

To be entitled to disability benefits, a claimant must show that all, and not only some, of the criteria for the listing are met.  Zebley, 493 U.S. at 530. An impairment that meets only some of the criteria for a listed impairment "no matter how severely, does not qualify."  Id.  The Commissioner makes the legal determination as to whether an impairment meets or equals a listing. See 20 C.F.R. § 404.1527(e)(1) and (2).

At step three in the sequential evaluation the ALJ assessed the plaintiff's depressive disorder under §§ 12.04 and 12.06 of the Listings, and found that he did not meet the threshold requirements of either listing.  Specifically, with regard to § 12.04, the ALJ found that a review of the "B" criteria revealed that the plaintiff's psychological impairments caused no more than moderate limitations on his activities of daily living, his ability to maintain social functioning and his ability to concentrate. (TR. 12).  Additionally, the ALJ determined that no extended periods of decompensation are documented on the record and that none of the "C" criteria of § 12.04 were met.  (TR. 12). Therefore, the ALJ concluded that a finding of disability could not be made at step three of the evaluation process.

Plaintiff argues that beyond the threshold requirements of § 12.04, he

also meets the "B" criteria.  However, the only evidence plaintiff presents to support his contention consists of his testimony and that of his mother.  (Doc. 7, pp.11-12).  The credibility of the plaintiff's subjective complaints will be discussed at length below, however, it should be noted at this point that the ALJ found the plaintiff's testimony regarding his symptoms and limitations not fully credible.  (TR. 15).

It is true, as the plaintiff alleges, that he was diagnosed with depression, however the law is clear that the existence of a medical condition alone does not demonstrate a disability for purposes of the Act.  See Petition of Sullivan, 904 F.2d 826, 845 (3d Cir. 1990).  Thus, the ALJ's determination does not deal with whether the plaintiff suffers from depression or anxiety, but whether it results in a functional disability that prevents the plaintiff from performing substantial gainful activity.  Here, a review of the record establishes that the plaintiff's depression and anxiety do not rise to the level of severity required under the "B" criteria of §12.04.

GAF assessments by the plaintiff's treating physicians only indicated mild to moderate limitations in activities of daily living and social functioning. (TR. 87-91,142).  Dr. Nezezon assessed the plaintiff with a GAF indicating only moderate limitations and Dr. Beldia assessed plaintiff with a GAF indicating mild to moderate limitations in those areas. (TR. 87-91,142). Similarly, in a report dated November 21, 2002, Dr. Patel indicated that the plaintiff had a good ability to follow work rules, relate to co-workers, deal with

13

the public and use judgment; a fair ability to interact with supervisors, deal with work stresses, function independently and maintain attention or concentration. (TR. 95). Additionally, Dr. Patel found that the plaintiff had a very good ability to maintain his personal appearance and a good ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (TR. 96).

The record also establishes that the plaintiff does not have marked restrictions in maintaining concentration, persistence or pace. Dr. Nezezon reported that the plaintiff was oriented as to time, person and place and that his thought processes were logical and goal oriented. (TR. 142). Records dated November, 1998 through December of 1999, indicate that Dr. de Soto consistently reported that the plaintiff was well groomed, cooperative and calm. (TR. 67-75). He noted that the plaintiff's affect was appropriate, speech was coherent and spontaneous and that his thought process was relevant. (TR. 67-75). The plaintiff's memory and judgment were consistently intact and he showed no signs of suicidality or homicidality. (TR. 67-75).

The record is devoid of evidence indicating that the plaintiff suffered from repeated episodes of decompensation or deterioration in work or work-like settings. (TR. 92-96). Additionally, it should be noted that the plaintiff was not fired from his last job due to limitations from his depression, but due to company cut backs. (TR. 149). The fact that the plaintiff was laid off for business reasons supports the ALJ's finding that the plaintiff is capable of

returning to work.  See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992).  In

Hunter, the plaintiff testified that he had stopped working due to a layoff and

not for any physical reasons.   The Court found that the plaintiff's own

testimony, that he left his prior employment due to an altercation with co -

workers, supported the ALJ's conclusions that he could return to his former

work.  Id. at 35.

Accordingly, we find that substantial evidence supports the ALJ's

decision at step three, that the plaintiff's impairments do not meet the

requirements of any of the listed impairments.


**B.**    ***WHETHER THE ALJ ERRED IN DISCOUNTING PLAINTIFF'S TESTIMONY REGARDING HIS SYMPTOMS AND LIMITATIONS.***

Plaintiff contends that even if his impairments did not meet the level of

severity required by Listing 12.04, the ALJ should have found him disabled at

step five of the sequential evaluation because considering plaintiff's age,

education, past work experience and residual functional capacity, including his

own testimony regarding his symptoms and limitations, he is not capable of

performing work in the national economy.  (Doc. 7, p.12).

The Social Security Regulations provide a framework under which a

plaintiff's subjective complaints are to be considered.  20 C.F.R. §404.1529.

First, symptoms, such as pain, shortness of breath, fatigue, *et cetera,* will only

be considered to affect a claimant's ability to perform work activities if such

15

symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. §40431529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  20 C.F.R. §404.1529(b).  In so doing, the medical evidence of record is considered along with the claimant's statements.  20 C.F.R. §404.1529(b).  Social Security Ruling 96-7 gives the following instruction in evaluating the credibility of the claimant's statements regarding his symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *see also Cassias v. Secretary of Health & Human Services.,* 933 F.2d 799, 801 (10th Cir. 1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility,')."  *Frazier v. Apfel,* 2000

WL 288246 (E.D.Pa. March 7, 2000).

Here, in assessing the plaintiff's RFC, the ALJ considered his subjective complaints and limitations pursuant to 20 C.F.R. 404.1529, 20 C.F.R 416.929 and Social Security Ruling 96-7p.  Plaintiff testified that he had problems with social anxiety and depression, had difficulty dealing with people in public situations and had a problem driving to social occasions.  He described a phobia of performing new jobs and tasks and stated that he was uncomfortable using the telephone.  At the time of the ALJ's decision, the plaintiff was seeing Dr. Nezezon and a counselor at Tri-County Mental Health every two months.  He stated that although he was taking his prescribed medication, he did not believe it was helping him.  The plaintiff's mother testified to essentially the same thing, noting that she and her husband did most things for the plaintiff.

The AlJ found the plaintiff's testimony to be less than fully credible.  The ALJ found that the objective evidence of record disclosed that the plaintiff had depressive and anxiety disorders which could cause limitations, but not to the extent alleged by the plaintiff. (TR. 15).  The ALJ found that the mental health professionals who treated the plaintiff opined that his impairments only cause moderate limitations on his ability to function. (TR.15). The plaintiff complained of having problems with depression and anxiety for quite some time, however he was still capable of doing well academically. He was also able to secure a job that he did well at up until the time he was laid off.

Additionally, the ALJ found that the plaintiff's treatment was not intensive for such a significant impairment. The plaintiff did have the Access card which would allow him more intensive treatment and he was receiving public assistance and food stamps as well.  The record also reveals that the plaintiff attempted to find work after his alleged onset date of disability.  The ALJ found that his attempt to obtain employment was indicative that, by plaintiff's own estimation, he was able to perform some sort of work activity despite his alleged anxiety and depression.  (TR. 15, 88).

The plaintiff's testimony establishes that the plaintiff can work, but that he experiences difficulty in obtaining employment as a result of his anxiety dealing with other people.  This is supported by his mother's testimony, his academic record as well as his work history.  However, the Regulations provide, in relevant part, "we will determine that you are not disabled if your residual functional capacity and vocational factors make it possible for you to do work which exists in the national economy, but you remain unemployed because of - your inability to get work.. ."  20 C.F.R § 404.1566(c)(1).

Accordingly, the ALJ found that the plaintiff did not have any physical impairments which would cause exertional limitations and concluded that he could do the full range of all exertional work levels. The ALJ determined, however, that the plaintiff did have psychological problems which restricted him to work activity that is not detailed or complex and involved working with things and not people.  (TR.16).

Additionally, none of plaintiff's treating physician's opined that he was unable to work.  Dr. Beldia assessed plaintiff with minor to moderate mental limitations and Dr. Nezezon assessed plaintiff with minor limitations.  (TR. 87-91, 142).  Dr. Patel's assessment, which was discussed above, also supports a finding that the plaintiff is capable of returning to work.

Based on the foregoing, we find that the plaintiff's lack of aggressive mental health treatment, his ability to do well academically and his ability to maintain employment strongly undermines his contention of disabling mental symptoms.  Accordingly, substantial evidence supports the ALJ's finding that the plaintiff's subjective complaints were less than fully credible.

**C.**   ***WHETHER THE ALJ ERRED IN FAILING TO ACCORD CONTROLLING WEIGHT TO DR. NEZEZON'S OPINION THAT PLAINTIFF WAS SIGNIFICANTLY IMPAIRED IN HIS ABILITY TO WORK.***

Finally, the plaintiff argues that it was erroneous for the ALJ not to fully credit the report of Dr. Nezezon, plaintiff's treating physician.  The ALJ is required to evaluate every medical opinion received.   20 C.F.R. § 404.1527(d).  Although he must consider all medical opinions, the better an explanation a source provides for an opinion, particularly through medical signs and laboratory findings, the more weight the ALJ will give that opinion. 20 C.F.R. § 404.1527 (d).  Automatic adoption of the opinion of the treating physician is not required.  See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir.

19

1991).

In <u>Jones</u>, 954 F.2d 125, the court held that, in the absence of contradictory medical evidence, an administrative law judge must accept the medical judgement of a treating physician.  However, the court also noted that these opinions need not be accepted where they are conclusory and unsupported by the medical evidence or where the opinions  are contradicted by the opinions of other physicians, including state agency physicians, who reviewed the findings of the treating physicians and concluded that these findings do not reveal a condition that would preclude gainful employment.

In <u>Williams v. Sullivan</u>, 970 F.2d 1178 (3d Cir. 1992), the court noted that while the administrative law judge may not base a decision upon his own interpretations of the significance of medical data, this does not prevent the administrative law judge from weighing medical reports against an internal contradiction and other contradictory medical evidence.

Here, the ALJ addressed Dr. Nezezon's opinions.  The doctor's notes revealed that he only saw claimant on five occasions since he first saw him on November 18, 2002. (TR.141).  Dr. Nezezon diagnosed plaintiff as having a generalized anxiety disorder, a social anxiety disorder and major depression.  (TR.142).  Dr. Nezezon opined that these conditions seriously impaired plaintiff's ability to function.  (TR.143-44).  However, he rated the plaintiff's GAF as 60, which represents that plaintiff's mental status causes only a moderate impairment on his ability to function.  (TR.142).  The ALJ

20

gave Dr. Nezezon's opinion considerable weight, with regard to plaintiff's GAF. However, he did not accord any weight to Dr. Nezezon's opinion that plaintiff's conditions severely impaired his ability to function because he found that it was inconsistent with the other evidence of record. The ALJ determined that substantial evidence in the record confirmed that plaintiff had only moderate difficulty with social and occupational functioning. (TR. 86-91, 92-96).

Plaintiff argues that his GAF rating of 60 indicates an overall moderate level of impairment, which, he argues, is not inconsistent with a finding that in a significant number of areas relevant to plaintiff's ability to perform a job, he is significantly impaired. (Doc.7, p.14). Dr. Nezezon did not assess the plaintiff with a GAF of 60 on merely one occasion; he assessed plaintiff with a past (twelve months) and present GAF indicating only moderate difficulties in social, occupational and school functioning. (TR.142). Dr. Nezezon did not indicate, at any time during plaintiff's treatment, that plaintiff had a GAF indicating serious mental limitations. We disagree with the plaintiff's argument that his GAF score is not inconsistent with a finding of significant impairment. We find that a consistent GAF score of 60 and above is highly probative as to the severity of plaintiff's impairments. In this case, it cannot be argued that plaintiff's moderate impairments render him unable to engage in substantial gainful activity.

Dr. Nezezon's other psychological evaluations also undermine his

21

opinion.   When evaluated by Dr. Nezezon, plaintiff was always neatly groomed and dressed appropriately.  (TR.142).  Although plaintiff's speech was generally slow, subdued, and limited, Dr. Nezezon noted that plaintiff's thought processes were logical, goal directed and oriented to person, place and time. (TR.142).  Plaintiff's memory, insight and judgment were always fair and he never appeared psychotic according to Dr. Nezezon.  (TR.142).

Additionally, Dr. Nezezon's opinion was not supported by the other objective evidence and medical opinions in the record.  Dr. Beldia assessed the plaintiff's GAF between 60 and 65 and Dr. Patel opined that plaintiff was not significantly limited due to his mental impairments. (TR. 95-96). Therefore, we find that substantial evidence exists in the record to support the ALJ's decision to accord limited weight to Dr. Nezezon's opinion that plaintiff's mental condition seriously affected his ability to function because it was not supported by his own findings, including his GAF assessment, Dr. Beldia's GAF assessment, or by Dr. Patel's opinion.

The plaintiff argues that "if the ALJ really felt that Dr. Nezezon's report was internally inconsistent, then he should have contacted the doctor and asked for an explanation." (Doc.7, p.14).  In support of his argument, plaintiff cites to <u>Duncan v. Barnhart</u>, 368 F.3d 820, 824 (8th Cir. 2004).  However, <u>Duncan</u> is easily distinguishable from the case at hand.  In <u>Duncan</u>, the treating physician assessed plaintiff with a one time GAF of 65.  However, in the year prior to that assessment, the Court noted that the plaintiff's highest

22

GAF score was a 50, indicating serious symptoms or impairments. Id. at 824. The Court stated, "while Dr. Singh's (treating physician) current GAF assessment of 65 may not have been inconsistent with the remainder of her opinions, the ALJ erred by simply disregarding the entirety of Dr. Singh's opinion, particularly when Dr. Singh otherwise consistently documented [plaintiff's] impairments." Id.

Here, Dr. Nezezon consistently assessed the plaintiff with a GAF of 60. Unlike Duncan, plaintiff's treating physician assessed his GAF at 60 for over one year.  As mentioned above, Dr. Nezezon never once reported that the plaintiff had a GAF indicating serious impairments.  As a whole, Dr. Nezezon's reports support the ALJ's findings that the plaintiff is not disabled under the Act.

Additionally, regardless of the inconsistencies within Dr. Nezezon's report, the record as a whole does not support his opinion that the plaintiff was significantly impaired in his ability to perform a job.  Contrary to plaintiff's assertion, Dr. Nezezon's opinion was not only rejected on the basis of internal inconsistencies but also because it was not supported by the record as a whole.  Therefore, we find that the ALJ was not required to contact Dr. Nezezon to explain the inconsistencies in his reports.

23

## V. Recommendation

Based upon the evidence of record, it is recommended that the plaintiff's appeal of the decision of the Commissioner of Social Security (Doc. No. 1) be **DENIED.**

<u>**s/ Malachy E. Mannion**</u>

**MALACHY E. MANNION**
**United States Magistrate Judge**

**Dated:**   March 16, 2005

O:\shared\REPORTS\2004 Reports\04-1076.wpd